# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>          Plaintiff,<br><br>v.<br><br>Matthew Bowen,<br><br>          Defendant. | No. CR-18-01013-TUC-CKJ (DTF)<br><br>**REPORT AND RECOMMENDATION** |

Before the Court is Defendant Bowen's motion to suppress evidence. (Docs. 29, 43.) The government filed its response opposing this motion. (Doc. 41.) The matter is before Magistrate Judge Ferraro for a report and recommendation because of a referral pursuant to LRCrim 5.1. An evidentiary hearing was held on March 14 and April 10, 2019. (Docs. 47, 54.) The Magistrate Judge recommends that the District Court, after its independent review, deny in part and grant in part the defendant's motion to suppress evidence.

## I.
## FACTUAL BACKGROUND

The factual background is taken verbatim from the affidavit submitted in support of the instant search warrant. At approximately 7:30 a.m., on Sunday, December 3, 2017, U.S. Customs and Border Protection (CBP) Officers assigned to the Nogales Port of Entry (POE) were monitoring Remote Video Surveillance Systems (RVSS) when they observed a suspected undocumented alien (UDA) on foot who appeared to have just jumped the

border fence at or near the Mariposa POE in Nogales, AZ, in the District of Arizona. Upon observing the suspected UDA, the CBP Officers telephoned the Nogales Border Patrol Station and reported the suspected UDA to the Border Patrol. BPAs of the Nogales Border Patrol Station, who were operating Border Patrol RVSS cameras, subsequently identified a lone male matching the description of the suspected UDA walking along the fence of the Mariposa POE. The Nogales Border Patrol Station RVSS camera operators trained their cameras on the suspected UDA and assisted BPAs responding in the field with locating the suspected UDA by providing information about what they saw over the radio, specifically, that the suspected UDA had started to run away from the Mariposa POE, towards an open lot containing several parked semi-trailers that was behind a Shell gas station, approximately 100 yards from the boundary fence of the Mariposa POE.

Approximately one to two minutes after the suspected UDA ran into the open lot containing the parked semi-trailers, the first of three (3) BPAs responded to the report of the suspected UDA in the area described by the RVSS operators. Two additional BPAs responded soon thereafter. The BPAs that responded were BPA Matthew Jaseph, BPA Khalil Garcia, and BPA Matthew Bowen. All three BPAs arrived separately, each driving marked Border Patrol vehicles. BPA Bowen was driving a 2017 Ford F-150 truck, the type commonly referred to by the Border Patrol as a "Kilo Unit," (hereinafter referred to as the "Subject Kilo Unit").

Upon arriving at the location provided by the Border Patrol RVSS operators, BPA Jaseph got out of his Border Patrol vehicle and searched for the suspected UDA on foot; BPAs Garcia and Bowen remained in their Border Patrol vehicles, driving slowly around the area where the suspected UDA was last seen.

A few minutes later, BPA Jaseph spotted the suspected UDA, later identified as Antolin Rolando Lopez-Aguilar ("Lopez-Aguilar"), a 23-year-old male Guatemalan national, hiding under a parked semi-trailer in the area, and instructed him to come out and surrender. Instead, Lopez-Aguilar ran back towards the POE fence in an apparent effort to avoid apprehension. As Lopez-Aguilar fled, BPA Bowen quickly turned the Subject Kilo

1  Unit he was driving and accelerated aggressively into a position behind the running Lopez-
2  Aguilar - this maneuver put the front grille of the Subject Kilo Unit centered directly behind
3  Lopez-Aguilar. As Lopez-Aguilar ran, BPA Bowen followed closely behind him, striking
4  Lopez-Aguilar twice with the front of the Subject Kilo Unit. The first contact between
5  Lopez-Aguilar and the Subject Kilo Unit occurred when Lopez-Aguilar reached back while
6  running and used his hand to "push off" of the hood of the Subject Kilo Unit, in an apparent
7  effort to create space between himself and the front of the truck, which had come up quickly
8  behind him. Less than two seconds later, BPA Bowen accelerated the Subject Kilo Unit
9  directly into the back of Lopez-Aguilar's body, knocking Lopez-Aguilar to the ground. The
10 tires of the Subject Kilo Unit truck came to a full stop within inches of running Lopez-
11 Aguilar over where he lay on the ground.

12 BPA Bowen jumped out of the Subject Kilo Unit, handcuffed Lopez-Aguilar and
13 pulled him to his feet.  BPAs Garcia and Jaseph arrived at the scene of the arrest seconds
14 later: BPA Garcia, in his Border Patrol vehicle, which he had also turned to intercept the
15 running Lopez-Aguilar by getting in between him and the POE fence, and BPA Jaseph on
16 foot.  BPA Bowen then handed Lopez-Aguilar over to BPAs Garcia and Jaseph, got back
17 into his truck, and drove away from the scene.  In subsequent interviews, both BPA Garcia
18 and BPA Jaseph noted that it was unusual for BPA Bowen to leave the scene so quickly,
19 and to leave his handcuffs behind. Based on my training and experience, I know that
20 common Border Patrol arrest procedures would dictate that an arresting agent would
21 transport someone they arrest, especially someone they have personally handcuffed, to the
22 detention facility.  Arresting BPAs then normally retrieve their handcuffs at the Detention
23 Facility after their prisoner has been received into booking and detention.

24 The entire Border Patrol response at the Mariposa POE, and arrest of Lopez-Aguilar
25 there, was video recorded from various cameras being operated by RVSS operators at the
26 Nogales Border Patrol Station as well as RVSS operators at the Nogales POE.

27 Lopez-Aguilar was taken to a local hospital in the Nogales, Arizona area to be
28 medically screened and evaluated for any injuries sustained as a result of the vehicle strike.

Abrasions to Lopez-Aguilar's right hand and both knees were documented before Lopez-Aguilar was sent back to the Nogales Border Patrol Station the same day with a medical clearance for prisoner transport to Tucson, Arizona.

On December 6, 2017, Special Agent Miers interviewed BPA Jaseph as a witness. During this interview, BPA Jaseph affirmed he was one of three BPAs responding to the call of a suspected UDA (Lopez-Aguilar) at the Mariposa POE during the morning hours of December 3, 2017, along with BPA Garcia and BPA Bowen. BPA Jaseph stated he was the first of the three responding BPAs to arrive at the Mariposa POE. Upon arriving at the Mariposa POE, BPA Jaseph exited his Border Patrol vehicle and began searching on foot for Lopez-Aguilar. BPA Jaseph eventually located Lopez-Aguilar lying under a parked semi-trailer in a lot in the area of the Mariposa POE. BPA Jaseph yelled out in Spanish for Lopez-Aguilar to get up and walk towards him (BPA Jaseph), but instead, Lopez-Aguilar got on his feet, and began running south towards Mexico. Although Lopez-Aguilar was not obeying verbal commands, BPA Jaseph did not sense a threat from Lopez-Aguilar. As BPA Jaseph was running after Lopez-Aguilar, the Subject Kilo Unit being operated by BPA Bowen got in between him and Lopez-Aguilar. Once in between himself and Lopez-Aguilar, the Subject Kilo Unit blocked BPA Jaseph's line of sight to Lopez-Aguilar, whom he was chasing. The Subject Kilo Unit came to an abrupt stop up in front of BPA Jaseph which allowed BPA Jaseph to catch up to the Subject Kilo Unit. As BPA Jaseph approached the Subject Kilo Unit he observed BPA Bowen arresting Lopez-Aguilar. Also present at the scene was BPA Garcia, who had arrived driving a Border Patrol vehicle. BPA Jaseph assisted BPA Bowen with getting Lopez-Aguilar up on his feet. Lopez-Aguilar was subdued at this time. Once on his feet, BPA Jaseph noticed an abrasion on Lopez-Aguilar's hand as well as gravel on the side of his (Lopez-Aguilar's) face. BPA Bowen stated he was going back to his assigned patrol area. BPAs Garcia and Jaseph took custody of Lopez-Aguilar who was shackled at this time in BPA Bowen's handcuffs.

After handing Lopez-Aguilar over for detention, BPA Jaseph went back to his patrol area, near where BPA Bowen was also patrolling. Once BPA Jaseph got back to his patrol

area, he contacted BPA Bowen via service radio and the two subsequently met at a location within the patrol area where BPA Jaseph returned BPA Bowen's handcuffs to BPA Bowen. BPAs Jaseph and Bowen went back to patrolling their assigned areas. After they met in person, BPAs Jaseph and Bowen exchanged a few text messages later that same day using their personal cellular telephones. During his interview, BPA Jaseph told investigators that he subsequently deleted those text messages and was therefore unable to share them. BPA Jaseph recalled that in one these text message exchanges, BPA Bowen sent him (BPA Joseph) a text message saying that someone from the station had reported he (BPA Bowen) ran Lopez-Aguilar over, but that BPA Bowen described the vehicle strike in the text message as merely "tapping" Lopez-Aguilar with the Subject Kilo Unit just prior to his arrest. To BPA Jaseph, the "tone" of BPA Bowen's text message was "angry," an observation that Special Agent Miers understood to mean that BPA Bowen felt frustrated or bothered by the attention that the incident was getting from others at the station.

Before the end of his shift, BPA Jaseph was contacted in the field by a supervisor, who instructed BPA Jaseph to report to the Acting Border Patrol Watch Commander back at the Nogales Border Patrol Station. The Acting Border Patrol Watch Commander told BPA Jaseph to write a memo regarding what he had seen and observed during the arrest of Lopez-Aguilar. BPA Jaseph wrote his memo and turned it in as instructed. Afterwards, BPA Jaseph went to the radio room, which is where the RVSS operators control remote cameras. The radio room supervisor allowed BPA Jaseph to view the video recording of the arrest of Lopez-Aguilar. Viewing the video in the radio room was the first time BPA Jaseph saw what actually happened after the Subject Kilo Unit driven by BPA Bowen got inbetween him and Lopez-Aguilar. BPA Jaseph saw on the video that the Subject Kilo Unit, driven by BPA Bowen, struck Lopez-Aguilar and knocked him to the ground. BPA Jaseph said "he'd never seen anything like that before" referring to the Subject Kilo Unit striking Lopez-Aguilar who was running away on foot. BPA Jaseph said that he and other BPAs all go through CBP Use of Force training and that he never saw or heard anything on the ground or on the video that caused him to sense a threat from Lopez-Aguilar. At

the conclusion of the interview, BPA Jaseph provided his cellular telephone number as 520-440-5735 and provided the cellular telephone number of 843-457-1679 as the number that he used to text BPA Bowen on the day of the incident.

Special Agent Miers subsequently searched an internal DHS employee directory, which determined that cellular telephone number 843-457-1679 was listed as BPA Bowen's "mobile number" in his online employee profile.

On December 27, 2017, two (2) separate Inspector General (IG) subpoenas were served; 1) on the telecommunications carrier T Mobile, and 2) on the telecommunications carrier AT&T Mobility. Both subpoenas requested subscriber, billing, device descriptions, and call data, for the date range December 1, 2017 to December 15, 2017, for the known telephone numbers being utilized by BPA Bowen (T Mobile), and BPA Jaseph (AT&T Mobility).

On January 29, 2018, Special Agent Miers reviewed a subpoena reply from AT&T Mobility in reference to information previously requested for BPA Jaseph's cellular telephone number (520-440-5735). This review revealed that cellular telephone number 520-440-5735 was associated with AT&T Mobility Account #265056770893, and that the Financially Liable Party and Billing Party for the account was Matthew Jaseph (BPA Jaseph). These records indicated Tiffani Jaseph, believed to the wife of BPA Jaseph, as the User of the cellular telephone. Call data reviewed from the subpoena reply revealed SMS messaging (text messaging) between 520-440-5735 (BPA Jaseph's cellular telephone number) and 843-457-1679 (BPA Bowen's cellular telephone number) during the morning hours on December 3, 2017 - evidence of these text messages would corroborate statements made by BPA Jaseph that after the arrest of Lopez-Aguilar on December 3, 2017, BPA Jaseph and BPA Bowen exchanged text messages between each other about the arrest of Lopez-Aguilar.

On February 5, 2018, Special Agent Miers reviewed a subpoena reply from T Mobile in reference to information previously requested for BPA Bowen's cellular telephone number (843-457-1679). This review revealed T Mobile was unable to comply

with the subpoena because the targeted cellular telephone number was not assigned to T Mobile for service during the scoped range. T Mobile suggested Verizon Wireless be contacted for the records being sought.

On February 7, 2018, an IG subpoena was served on Cellco Partnership, DBA Verizon Wireless (Verizon Wireless). This subpoena requested subscriber, billing, a device description, and call data for the date range December 1, 2017 to December 31, 2017 for BPA Bowen's cellular telephone number (843-457-1679).

On March 6, 2018, Special Agent Miers reviewed a subpoena reply from Verizon Wireless in reference to information previously requested for BPA Bowen's cellular telephone number (843-457-1679). This review revealed that cellular telephone number 843-457-1679 was associated with Verizon Wireless Account #873327719-1, and that the subscriber for this account was Candy Bowen, 328 N. Old Camp Road, Sahuarita, AZ. Candy Bowen is believed to be the wife of BPA Bowen. Call data reviewed from the Verizon Wireless subpoena reply revealed SMS messaging (text messaging) between 843-457-1679 (BPA Bowen's cellular telephone phone number) and 520-440-5735 (BPA Jaseph's cellular telephone phone number) during the morning hours of December 3, 2017 - evidence of these text messages would corroborate statements made by BPA Jaseph that after the arrest of Lopez-Aguilar on December 3, 2017, BPA Jaseph and BPA Bowen exchanged text messages between each other about the arrest of Lopez-Aguilar.

## II.

## **DISCUSSION**

Defendant Bowen moves to suppress text messages seized from his phone. He argues the search warrant was overbroad, alternatively, the warrant's execution was overly broad. The government replies that the search warrant was narrow and the seized text messages were supported by probable cause.

> An evaluation of the constitutionality of a search warrant should begin with the rule that 'the informed and deliberate determinations of magistrates empowered to issue warrants * * * are to be preferred over the hurried action of officers * * * who may happen to make arrests.' [Citation omitted.] The

>reasons for this rule go to the foundations of the Fourth Amendment. [Citation omitted.] In *Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 735, 4 L.Ed.2d 697, this Court, strongly supporting the preference to be accorded searches under a warrant, indicated that in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall.

*United States v. Ventresca*, 380 U.S. 102, 105-106 (1965).

The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and **particularly describing the place to be searched, and the persons or things to be seized**." (Emphasis added.)  "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 512 (1965); *United States v. Mann*, 389 F.3d 869, 877 (9th Cir. 2004) ("description must be specific enough to enable the person conducting the search reasonably to identify the things authorized to be seized").

Guided by the Supreme Court precedent, reviewing courts should not "flyspeck" the affidavit supporting a search warrant; "rather, the magistrate judge's determination "'should be paid great deference.'" *Gourde*, 440 F.3d at 1069 (quoting Gates, 462 U.S. at 236, 103 S.Ct. 2317 (*quoting Spinelli v. United States*, 393 U.S. 410, 419 (1969)). In addition, the Supreme Court has reminded reviewing courts that "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, resolution of doubtful or marginal cases in this area should largely be determined by the preference to be accorded to warrants." *Gates*, 462 U.S. at 237 n. 10, (*quoting United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Here, the search warrant affidavit describes events on December 3, 2017, that led to the defendant's arrest. The affidavit also details the subsequent investigation, which showed the defendant communicating by text message to BPA Jaseph on December 3 about the incident. Attachment B to the search warrant describes the items to be seized and limited the search to "items which pertain in any way to an alleged civil rights violation

- 8 -

that occurred on December 3, 2017." The Court finds these words do limit the search range. Thus, the warrant was sufficiently precise to prevent the agents from conducting a general search of the defendant's phone. However, the Court rejects the defendant's argument that search was limited to only December 3. According to BPA Jaseph, "the 'tone' of BPA Bowen's text message was 'angry,' an observation that Special Agent Miers understood to mean that BPA Bowen felt frustrated or bothered by the attention that the incident was getting from others at the station." Given the multiple text messages the defendant sent to BPA Jaseph and the defendant's apparent frustration with the attention the incident received "from others at the station," it is was a fair probability the defendant would have communicated by text message with others about the incident. Accordingly, in Attachment B, "Items to be Seized," the warrant authorized the search and seizure of specific forms of data "which pertain in any way to an alleged civil rights violation that occurred on December 3, 2017," would include messages after that date that pertain to the civil rights violation.

Apparently, the search execution was not limited to a date. Rather, the agents were guided only by the "pertaining to the civil rights violation" language because text messages before the incident were seized. The government argues these earlier text messages pertain to the civil rights violation because they disclose the defendant's frustration with Border Patrol policy and animus or frustration with undocumented aliens. The government reasons that these text messages are evidence of the defendant's motive and intent to violate the victim's civil rights.

The Court rejects the government's argument concerning text messages seized before December 3. The civil rights violation referred to in the affidavit was not preplanned. It was a spontaneous event, which was described in the affidavit as, the defendant "accelerated the Subject Kilo Unit directly into the back of Lopez-Aguilar's body, knocking Lopez-Aguilar to the ground." Assuming the text messages before December 3 pertain to the defendant's "frustration with Border Patrol policy and animus or frustration with undocumented aliens" then they pertain to the defendant's propensity to

commit an offense. If the terms in the search warrant are read to include propensity to commit a civil rights violation, then the warrant's breadth is left to the agents, not the neutral and detach magistrate. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and **prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.**" (Emphasis added.) *Stanford v. Texas*, 379 U.S. 476, 486 (1965), *quoting Marron v. United States*, 275 U.S. 192, 196 (1927). The government's reading permits the seizure of propensity evidence – one thing -- under a warrant that described another – a civil rights violation.

A common sense reading of the search warrant limits the search to a date on or after the actual event, which pertains to the event. Therefore, the Court finds text messages dated before December 3, 2017 are outside the search warrant's scope.

The government argues in the alternative that if the text messages before December 3 were outside the scope of the search warrant then they were in plain view and were lawfully seized. Law enforcement officers may seize evidence that is in "plain view" provided the seizing officer must not "violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed." *Horton v. California*, 496 U.S. 128, 136 (1990); *United States v. Arreguin*, 735 F.3d 1168, 1179 (9th Cir. 2013) ("the plain view doctrine does not apply unless the initial entry is lawful, either pursuant to a warrant or under a recognized exception to the warrant requirement").

The defense called an expert on the software used to search the cellphone. The government accepted the witness' expertise and did not ask a single question in cross-examination. According to the defense expert, the software used to search the defendant's cell phone could have limited the search to certain dates. Defense exhibit 2, admitted without objection, depicts a screen shot of the search settings that can easily be used to set a beginning and ending date for the search. Had the search been limited to December 3 and after, the text messages before that date would not have been displayed and would not

have been possible to view. Accordingly, the Court finds the text messages dated prior to December 3 were not in plain view.

## III.
## RECOMMENDATION

It is recommended as follows:

This Court recommends that the district court grant the defendant's request to suppress all text messages prior to December 3, 2017.

This Court recommends that the district court deny the defendant's request to suppress the text messages on or after December 3, 2017, seized pursuant to the search warrant.

In sum, it is recommended that, after its independent review of the record, the District Court **grant in part** and **deny in part** Defendant's motion to suppress. (Docs. 29 and 43.)

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within fourteen days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If objections are not timely filed, they may be deemed waived.

Dated this 16th day of April, 2019.

Honorable D. Thomas Ferraro
United States Magistrate Judge